UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY M.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 19 cv 2894 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| ANDREW M. SAUL, Commissioner of the Social Security Administration,[2] | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff's claim for Social Security disability benefits comes before the Court for the *third* time. In Case No. 14-cv-10453, the Court remanded the matter back to the ALJ because his decision improperly disregarded the opinion of plaintiff's treating physician. Specifically, the Court found the ALJ had ignored the medical evidence supporting that opinion, including substantial evidence from after Plaintiff's date last insured ("DLI"), and did not follow the treating physician rule. In the Court's second decision in Case No. 17-cv-2894, the Court again remanded the case back to the ALJ, this time to consider post-DLI medical evidence supporting the opinion of Plaintiff's treating physician. In the case presently before the Court, the ALJ again chose to disregard the opinion of Plaintiff's long-time treating physician that supports her claim for disability benefits. Because the record as a whole demonstrates there is no reason to disregard this opinion, the Court declines to remand the case again for fact-findings, but only to determine the amount of Plaintiff's benefits. Plaintiff's motion for summary judgment [dkt. 11] is GRANTED.

---

[1] In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by her first name and the first initial of her last name(s).

[2] As of June 4, 2019, Andrew M. Saul is the Commissioner of the Social Security Administration. Pursuant to Federal Rule Civil Procedure 25(d), he is hereby substituted as Defendant.

## I. Factual Background

### a. Prior Medical Evidence

Plaintiff's long medical history has been set out in great detail in the Court's previous opinions and will not be repeated here. Suffice it to say that Plaintiff is a 54-year-old woman who had primarily served as an office worker until she injured her back in 1999 pushing a wheelbarrow full of gravel. Dr. James Wilson treated Plaintiff and continued to treat her through at least the date of her last hearing. Plaintiff's treatments included pain medications, spinal injections, muscle relaxants and physical therapy. She continued working through 2005 when she had to lift a ten-gallon bag of ice at work and wrenched her back. After this accident, Plaintiff did not return to work, but instead began an odyssey of escalating medical treatments, including a percutaneous disc compression, a discectomy and laminectomy, a spinal fusion with the insertion of rods to stabilize her spinal area, and, in 2016, a cervical spine surgery. Although Plaintiff's symptoms would temporarily subside after these interventions, she continued to have significant pain in her spine, right hip, buttock and leg. Over the years, Dr. Wilson has prescribed a number of different medications and combinations of medications to lessen Plaintiff's pain, including methadone and oxycodone. None have been completely effective in eliminating Plaintiff's pain.

### b. Evidence from the Third Administrative Hearing

At the third administrative hearing on Plaintiff's disability claim, additional documentary evidence was received into the record before ALJ Deborah Ellis. This evidence included additional treatment records from Dr. Wilson, Plaintiff's treating physician, who is a pain management specialist, and records of her psychologist, Dr. Preston Harley. In addition, Plaintiff and a vocational expert both testified at the latest administrative hearing before the ALJ. The Court will summarize this new evidence.

In his extensive treatment records, Dr. Wilson submitted monthly treatment records substantiating Plaintiff's need for pain relief during the time period since the last hearing on her disability claim. (Administrative Record ("R.") 460-572, 574-611, 716-718, 1038-1053, 1067-1189, 1597-1700, 1740-1803.) In sum, these records show Plaintiff continued to treat with Dr. Wilson for pain in the affected area ranging from a level between four and nine. The pain, which Dr. Wilson found to be unexaggerated by Plaintiff, is aggravated by all manner of physical activity including sitting, standing, bending, driving and walking, and which can only be lessened by a frequent change in physical position and a substantial combination of pain medications. The Court particularly draws attention to a 2018 letter from Dr. Wilson (in response to a specific request by Plaintiff's attorney) in which he further explained his previous opinion concerning the extent of Plaintiff's disability on or before June 30, 2010. In that letter, Dr. Wilson gave context to particular notes he had made during his treatment of Plaintiff. (R. 1829.) Dr. Wilson noted that he was "fascinated" that someone so unable to do useful work was still fighting for her disability benefits, a sentiment that, based on the record in this case, the Court shares. Dr. Wilson reiterated his 2013 opinion that Plaintiff was disabled between her onset date and June 30, 2010. He further stated that her condition had only worsened since that time period and that it was now a permanent condition. He explained (again based on several years of treating Plaintiff before 2010 and after) that when he noted in his records that she was "in no apparent distress," he meant that the Plaintiff was presently before him and was not in need of emergent care. He further clarified his notes concerning effects of prescribed medication on Plaintiff's symptoms. He explained that he was required to document the "4 A's" regarding medication: (1) "activities improved with medication;" (2) "aberrancy of drug-taking behavior;" (3) no adverse reactions; and (4) analgesia. None of these notations changed his opinion about the extent of her disability. When he previously stated in office records that Plaintiff was not

3

having difficulty standing, he further explained that she also had not been able to hold this position or *any* this position for more than five minutes, let alone fifteen. Tellingly he said the following: "I probably did Kimberly a disservice by not making more detailed descriptions of her antalgic [a gait developed to try to avoid pain] and grimace with position shift in her notes." (*Id.*)

Plaintiff also met with a psychologist (Dr. Preston Harley) in April, August, and December of 2015; April, July, and October of 2016; June of 2017; and March, July, and November of 2018. The purpose of these visits according to Dr. Harley was to use cognitive behavioral therapy to address her on-going pain and emotional distress and sleeplessness resulting from the pain. These records obviously post-date her DLI but reflect observations from and about Plaintiff that are relevant here. Dr. Harley observed that Plaintiff often needed to stand, rather than sit, during sessions. She grimaced and had difficulty walking. Plaintiff reported to Dr. Harley that she restricted her activities to no more than twenty minutes, did her necessary housework in brief segments, and had chronic pain in the low back legs at a level of 6-7. (R. 1807-1817.)

Plaintiff testified in person at the third administrative hearing. She described her activities during the day as limited in duration because of the pain that radiates in her back and down her legs. After completing a household task, she needs to rest and change position. She could only accomplish a household task like doing the laundry in 15-20-minute intervals. She often needed to lay down during the day. She continues to do household tasks so that she has a sense of self-worth. She manages her pain through the medications prescribed by Dr. Wilson, but they do not completely alleviate her pain that, in her right leg, can range from a 5 to a 10 in severity. When the pain reaches the level of 10, Plaintiff takes to her bed for a day or two. This occurs about once a month. Plaintiff also testified that the more she tries to do, the worse the pain gets. (R. 1372-1396.)

4

A vocational expert ("VE") also testified at the third administrative hearing. The ALJ posed a hypothetical in which the individual was limited to light work and a low stress environment, away from the general public; frequently requiring climbing of ramps and stairs but no ladders, ropes, or scaffolds; occasionally balances, crouches, and crawls; can change position at a work station every 45-60 minutes by standing up or stretching; and absent one day a month. The VE testified that such limitations would still allow that hypothetical person to engage in certain of the employment previously engaged in by Plaintiff. Further, if that person was limited to sedentary restrictions, the hypothetical person could still perform one of the jobs that Plaintiff had performed. On cross examination, however, the VE admitted that restrictions which included being off task for more than 15% of the time; being absent one day per month; being unable to sit, stand, or walk for no more than 15 minutes during 60 minute period or do those activities for no more than 3 hours during an 8 hour period; needed to lay down 15-20 minutes each hour and elevate her feet to a ninety degree angle would eliminate such a job. (R. 1396-1402.)

    c.   **The ALJ's Decision**

The ALJ issued a written decision on January 25, 2018. (R. 1346-1360.) As an initial matter, the ALJ found that Plaintiff met the insured status requirements of the Act through June 30, 2010. *Id*. At step one, the ALJ determined that Plaintiff did not engage in Substantial Gainful Activity since her alleged onset date of November 2, 2005. *Id*. At step two, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease and obesity. *Id*. At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R., Part 404, Subpart P, App'x. *Id.* At step four, the ALJ assessed assessed Plaintiff's Residual Functional Capacity ("RFC") and determined that Plaintiff could perform light work except that she was limited to work that allowed her to sit and stand alternatively at will provided she was not off-

task more than 10% of the work period; she could never climb ladders, ropes, or scaffolds; she could frequently climb ramps and stairs, balance, crouch, and kneel; she could only occasionally stoop and crawl; she was to avoid concentrated exposure to extreme cold, excessive vibrations, moving machinery, and unprotected heights; she could change positions at the workstation every 45 to 60 minutes if necessary and move around in her chair and elevate her legs 4-6 inches under her chair/desk as needed; she would be off task up to 15% of the day and absent no more than one day per month. *Id*. At the final step, the ALJ found Plaintiff capable of performing her last relevant work as a general office clerk and an office manager. *Id*.

## II. Social Security Regulations and Standard of Review

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment (or, in this case, the combination of impairments) meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 404.1523; 20 C.F.R. § 404.1545; 20 C.F.R. § 416.920(a)(4)(i)-(v). While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. S.S.R. 96-8p, 1996 WL 374184, *5 (July 2, 1996). If the impairment(s) does meet or equal this standard, the inquiry is over and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age,

education, and prior work experience and evaluate whether she is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id*. At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show that there are jobs that the claimant is able to perform, in which case a finding of not disabled is due. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also*, 42 U.S.C.§ 405(g).

### III. Analysis

Plaintiff's challenges to the ALJ's findings focus on whether the ALJ erred in rejecting both her long-time treating physician's opinion that she is disabled and the intensity; persistence

and severity of her reported pain. The ALJ cited a number or reasons why she chose to reject Plaintiff's long-standing treating physician's opinion, as well as her own reports of debilitating pain, but none of them hold up to scrutiny.

The ALJ in this case gave lip service to the importance of the treating physician's opinion, but did not follow the applicable standards in her evaluation. Dr. Wilson, who treated plaintiff on a monthly basis for more ten years, is the treating physician in this case. Accordingly, his opinions about the extent of Plaintiff's disability were to be given controlling weight if well supported by medical findings and not inconsistent with other substantial evidence in the record. This standard exists because the treating physicians are most familiar with the claimant's conditions and circumstances. *Israel v. Colvin*, 840 F.3d 432, 437 (7th Cir. 2016) (citations omitted).

In this case, the ALJ erroneously chose to ignore many years of pain management treatment by Dr. Wilson in favor of non-treating experts with no special expertise in pain management. Her reasons for doing so almost entirely rely on impermissible "cherry-picking" of statements from the medical records to show Plaintiff's intermittent improvement, but ignoring the import of the vast majority of the records that demonstrate the opposite. *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). Statements relied upon by the ALJ (*e.g.*, that Plaintiff "was not in any distress" or that her gait during an office visit "did not appear abnormal") to reject Dr. Wilson' opinions certainly do appear in his treatment records. But these statements must be read in the context of Plaintiff's overall treatment. Dr. Wilson explained that these observations of seemingly normal functioning were very limited and episodic in nature. (R.1829.) For example, when he stated that plaintiff did not appear to be in "distress" during a particular office visit, he meant that she did not present needing emergent care. (*Id.*) Such isolated statements picked from an extensive record of pain management simply do not justify the ALJ's wholesale rejection of

8

Dr. Wilson's opinion. In fact, the ALJ's discussion of Dr. Wilson's extensive treatment notes is an exercise of pointing out the periodic improvements Dr. Wilson could observe during Plaintiff's monthly office visits, while at the same time simply ignoring that the record as a whole demonstrated Plaintiff's continued struggle with significant pain. Dr. Wilson's treatment records are replete with examples of Plaintiff complaining that her condition was either not improved or indeed worsening despite his attempts to use narcotics like methadone to control it. (R. 325, 375, 465, 501, 511.)

The ALJ similarly cherry-picked comments made by Plaintiff's other doctors, such as her surgeon, Dr. Steven Coventry, who stated that Plaintiff had some improvement after her 2006 surgery and that the surgery was a success. (R. 1358.) However, the medical record as a whole demonstrates Plaintiff's increased need for additional surgical and other interventions even after that 2006 surgery. Medical records submitted in this case show that on November 7, 2005, Plaintiff had a percutaneous disc compression procedure, a minimally invasive procedure to address her back pain. (R. 319-320.) But, because the pain persisted after this procedure, she had an identical procedure a little more than a year later. (R.322-323.) Because Plaintiff's MRI of April 17, 2006 showed degenerative changes in her lumbar spine and stenosis, she underwent an invasive spinal surgery during which part of the vertebra is removed from the spine. (R. 281-291, 296-297.) Although Dr. Coventry believed that Plaintiff's surgery showed "excellent results", he also found that there was an unaddressed and unchanged disc disease in the lower region of her back. (R. 300-301.) Plaintiff continued to continue to report significant pain to Dr. Wilson, and an MRI taken in November 2006 showed disc-bulging and asymmetric scar tissue. (R. 340.) Thus, while the surgery initially might have been deemed a success, there is no factual dispute that Plaintiff's pain nevertheless continued and by January 2008 was severe enough to begin receiving joint injections to help alleviate her distress. (R. 325.)

9

The ALJ also relied on another of Plaintiff's treaters, Dr. Dalip Pelinkovic, who opined that Plaintiff's motor strength was normal and commented that Plaintiff was the caretaker of her daughter who needed help with basic activities, to reject Dr. Wilson's opinion. The ALJ found that this activity demonstrated Plaintiff was not as limited as Dr. Wilson stated. (R. 1359.) But these comments ignore the reason Plaintiff was even seeing this doctor. Dr. Wilson referred Plaintiff to Dr. Pelinkovic in 2008 for an MRI of her back because it was still causing her pain. (R. 335.) The radiologist who read this MRI reported to Dr. Pelinkovic that Plaintiff had "moderate to severe narrowing of L5-S1 disc space. " (*Id.*) In her follow-up visit in early 2009 with Dr. Pelinkovic, he stated that Plaintiff might have recurrent disc herniation that was impinging on the nerve root on the right based on this MRI. (R. 374.) His comment about Plaintiff's care of her disabled daughter, upon which the ALJ placed such weight, was reported in July 2009 during which he also stated Plaintiff was severely limited in all activities of daily living. (R. 373.) Further, although Plaintiff (by necessity and with help from her family) cared for her disabled daughter, she testified she had to take many breaks to do so and that the effort aggravated her condition. (R. 60-61, 785-86.)

The ALJ also pointed to Plaintiff's failure to rise out of her chair during the hour and a half long second administrative hearing in November 2016 as proof that Dr. Wilson's finding that she could not sustain a position for more than fifteen minutes should be rejected. The Court finds this assertion most troubling. During that administrative hearing, Plaintiff testified that during the hearing she had to "keep moving positions. My legs keep going numb. I have extreme nerve pain." (R. 803.) Plaintiff curled her legs up under her and explained that she was doing this because she was unable to lie down. She testified: "I need to lay down. I've been up too long." (R. 804.) Plaintiff made it completely clear to the ALJ that although she was holding her sitting position (no doubt because she believed it was required of her), she did so with considerable

10

pain. Plaintiff's painful endurance at the hearing does not contradict her treating physician's opinion.

The ALJ stated that because Dr. Wilson's opinions were based on subjective complaints and not supported by the objective medical evidence, they must necessarily be rejected. The converse is true. The voluminous records show that Plaintiff had a consistent history of back pain and had undergone several measures to manage it including injection therapy, physical therapy, a percutaeous disc compression, surgery, and medication. Dr. Pelinkovic recommended surgery in 2009 and 2011 to address Plaintiff's diagnosed disc herniation. (R. 372, 374.) After treating her with medication for several years and achieving only partial success, Dr. Wilson eventually referred plaintiff to Dr. Mir Ali, an orthopedist, in 2011. Dr. Ali found that Plaintiff's pain was limited to her lower back, but worsened with prolonged sitting, flexing, and twisting, noting that she had become reliant on narcotics for pain relief. (R. 396-400.) Eventually, Plaintiff ultimately underwent another surgical procedure to correct her lumbar spinal stenosis in 2012. (R. 684-89.)

The ALJ's explanation why she rejected Dr. Wilson's opinion ignores the clear and negative trajectory of her condition. Further, the ALJ rejected Dr. Wilson's opinions in favor of opinions by two consulting experts, Dr. Nenaber and Dr. Mitra, neither of whom examined the plaintiff. But the ALJ cherry-picks these opinions to get to his result as well. As discussed further below, the ALJ rejected Plaintiff's testimony (and Dr. Wilson's finding) about the extent and severity of her pain. But these same consulting doctors both found that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms were substantiated by the objective medical evidence. (R. 111, 120.) The ALJ never explains why she credits the part of the consultants' opinion that Plaintiff's RFC would allow some limited work, but not the part that contradicted her finding that Plaintiff's report of pain is entirely consistent with the objective medical evidence in the record. In any event, the Court does not find that these

11

opinions are dispositive or even contradictory of Dr. Wilson as they are entirely reliant on the record he and Plaintiff's other treaters provided. The conclusion in both opinions that Plaintiff could still do some limited light work is solely based on the assumption that Plaintiff "seemed" to get good relief from her medications. (R. 112, 122.) But the medical evidence (along with Plaintiff's own testimony) upon which this conclusion rests only shows that while Plaintiff's condition improved with medication, she still was extremely limited in her day-to-day activities. Accordingly, there is no rational basis to rely on these opinions to reject Dr. Wilson's conclusion to the contrary.

The ALJ also held that Plaintiff's testimony about the intensity; persistence and limiting effects of her reported pain were not supported by the objective medical evidence. However, even the consulting medical experts found to the contrary, a finding the ALJ never bothers to address. During the time after her surgery in 2006, described as "stable" by the ALJ, Plaintiff regularly needed significant pain medication from Dr. Wilson. (R. 332-33.) And, of course, in 2008, Dr. Wilson referred Plaintiff to Dr. Pelinkovic because the medication was ineffective in controlling her pain. That doctor recommended that Plaintiff consider surgery for her herniated discs. She did not have surgery until after her DLI, but the records indicate that Plaintiff consistently reported pain on her monthly visits to Dr. Wilson. (R. 501-30.)

In spite of all the objective medical evidence to the contrary, the ALJ rejected Plaintiff's testimony of disabling pain. Of course, even if the ALJ did not find the medical evidence sufficient to account for this pain, Plaintiff's own testimony of severe pain cannot simply be disregarded. *Hall v. Colvin*, 778 F.3d 668, 691 (7th Cir. 2015); *Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) ("[p]ain can be severe to the point of being disabling even though no physical cause can be identified"). Instead of relying on the consulting experts who found that Plaintiff's pain was consistent with the medical evidence, she relied instead on Plaintiff's care of

her disabled daughter, as well as Dr. Wilson's report that Plaintiff had good hygiene and could still do household chores. However, as the Seventh Circuit has stated, these abilities say little about how Plaintiff could manage the requirements of the work place. *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016). A person performing such tasks has flexibility in scheduling, can receive help and is not held to a minimum standard of performance, unlike an employee. *Id.* (citing *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012)). Finally, the ALJ stated that Plaintiff's ability to sit through the lengthy administrative hearings was evidence that she was not as limited as she and Dr. Wilson asserted. This statement beggars belief when one reads the transcript of plaintiff's hearings during which Plaintiff made it clear she was in significant pain. The fact Plaintiff endured pain to bring this matter to conclusion should not be held against her, particularly when that pain is so thoroughly documented in the records in this case.

## IV. Conclusion

In conclusion, the medical records in this case show that Plaintiff has undergone numerous non-surgical measures to manage her pain, such as injection therapy, physical therapy, and a percutaneous disc compression, as well as two surgical procedures. In addition, she has received numerous different medications, including methadone, vicodin, and morphine, in the same effort. Despite these interventions, Dr. Wilson's opinion is that Plaintiff is still unable to sustain physical activity for more than fifteen minutes without pain; a condition that the vocational expert found would preclude work. Plaintiff has requested that the Court find that she is, in fact, disabled, instead of remanding the case for a third time for additional findings.

When a reviewing court remands to the Appeals Council, the ordinary remedy is another administrative hearing. In unusual cases, when the relevant factual issues have been resolved and the record requires a finding of disability, a court may order an award of benefits. *Kaminski v. Berryhill*, 849 F.3d 870, 875 (7th Cir. 2018). In this case, if the treating physician's opinion is

properly credited, there is no question that Plaintiff is disabled. The facts cited by the ALJ do not discredit Dr. Wilson's opinion in any meaningful way. Further, there is no dispute in this record that Plaintiff's complaints of disabling pain are supported by the objective medical evidence in the record, including the State's consulting experts, and that this pain is severe enough to prevent her from performing work in the national economy. Plaintiff alleges disability beginning in 2005 and has been fighting for her benefits since 2013. The Court sees no reason to remand the case for a third hearing. Accordingly, Plaintiff's motion for summary judgment [dkt. 11] is GRANTED and the Court remands the case to the agency with the instruction to calculate and award benefits to Plaintiff.

Entered: 4/27/2020

Susan E. Cox,
United States Magistrate Judge